May it please the Court, Eric Murphy, State Solicitor of Ohio for the State Appellants. I'd like to reserve five minutes for rebuttal. Fine. The Supreme Court's decision in Glossop v. Gross resolves for the State the three legal issues presented to this Court today. First, Glossop held that an individual challenging a lethal injection protocol must identify an alternative protocol that is available, feasible, and readily implemented. The District Court in this case, however, committed legal error when it interpreted this alternative element as being satisfied based on the mere possibility that Ohio could obtain barbiturates sometime in the future, even though Ohio has been unable to obtain those types of drugs for several years. Second, as many appellate courts have noted after Glossop, that case shows that the midazolam three drug method does not create a substantial risk of pain that is sure or very likely to occur. And here again, the District Court committed legal error by finding that plaintiffs satisfied this demanding burden of proof based on alleged uncertainties over midazolam's effects. Third, so the District Court actually, unlike the District Court in Glossop, never made a finding about whether midazolam would render an inmate insensate the pain. At the fact-finding pages 32226-28 of the District Court's opinion, it said, while it seems like there are certain differences in body movements and things of that sort with respect to the use of midazolam versus barbiturates, the District Court never suggested that midazolam would not be effective in rendering an inmate insensate the pain. And it's our position that this was legal error under Glossop because Glossop made quite clear that it's the plaintiff's burden to prove a very high standard. And that standard is that the relevant execution method is sure or very likely to cause severe pain. And while the District Court, at the end of its analysis, suggested that the plaintiffs had satisfied the substantial risk test, it's our position that that test is the ultimate legal finding, which is subject to the fresh review, the novel review by this Court. Based on intervening executions, correct? Well, it pointed to several intervening executions, but none of them, in fact – well, three of them, in fact, were not intervening. So the District Court identified the executions in McGuire, in Lockett, in Smith, and in Wood. But three of the four had happened at the time of Glossop, and all three of them were mentioned in the petitioner's brief to the Supreme Court, and two of them were mentioned by the Supreme Court itself as having little probative value with respect to this method of execution, precisely because they involved different methods. So the Lockett case involved only 100 milligrams of midazolam, not the large, massive dose that the Supreme Court said is at issue here, 500 milligrams. So that's not an intervening event. It has already happened. Now, the plaintiffs point out that – Mr. Murphy, if I could just ask you one question. I kind of read your brief to mean that – or to say that the Supreme Court's factual holding, so to speak, in Glossop is binding on us here and was binding on the District Court. Is that a fair characterization? That's true, yes. But what about the fact that the Supreme Court does couch that very finding in terms of the deferential standard of review? I mean, the court said the District Court did not clearly err in finding that midazolam is highly effective or something at preventing the inmate from feeling pain. I mean, by its terms, it's specific to the record there, isn't it? So I think it's – we certainly do not dispute that it used clear language. But I think when read in the broader context, I think I have a logical response and a precedential response. The logical response is I think we would all agree that either the midazolam three drug protocol is constitutional or it is not. It can't be constitutional in Ohio and not in Illinois. That is a bit of a quandary, and I do plan to ask opposing counsel about that. But couldn't there be new evidence that would show that midazolam is, in fact, not safe in the sense of not preventing pain? I don't think they have met that standard, if there was a new evidence standard. But setting that aside, I think the new evidence would have to be pretty significant to distinguish gloss up. I think when we talk about legislative facts, this is what we're talking about. But you're the ones who are talking about legislative facts as opposed to other people. You're trying to force us into that method of analysis. I think that's the logical implications of gloss up for the reasons we suggest. I think even the author of gloss up, Justice Alito, in his base concurrence, suggested that the plaintiff's burden of proof to show very or surely likely is essentially it requires them to do more than simply offer the testimony of a few experts or a few studies. Instead, an inmate challenging a method of execution should point to a well-established scientific consensus. So I think that's the standard they have to meet. I don't think that they met it in gloss up because of the clear air language, and I don't think they have any new evidence to establish a well-established medical consensus here precisely because of the experts. I wanted to get back to Judge Ketlet's point, the presidential point. I think there are several courts that have interpreted gloss up, including, for instance, the estate of Lockett case in the Tenth Circuit. And in that case, they actually, the plaintiff in that case, brought an Eighth Amendment challenge to essentially this direct protocol. And the court suggested at the pleading stage that the challenge build, which showed that they viewed gloss up controlling without even considering any evidence. And in footnote five of that decision, they talked about the allegation where the plaintiff in that case expressly said that midazolam would not work to render them insensate to pain, and they called that a legal conclusion post-gloss up and that it was in conflict with gloss up. And this is which court? Estate of Lockett, and that was footnote five of estate of Lockett. Which court? The Tenth Circuit. The Tenth Circuit, so it's not binding. It's certainly not binding, no. And the Eleventh Circuit expressly, essentially said the same thing in the Arthur case as well. So I do think, despite the clear air language, I think we have the logical point that there is one Eighth Amendment, and that Eighth Amendment means the same thing in Ohio, and then we have the presidential. Wouldn't there be a problem, though, in your theory, that it would make the law depend on which court was reviewed first? So, for instance, if the clear air standard is the standard that's being applied and this district court was the one that was being reviewed and the clear air standard applied to that, we could have a very different result than in the situation of gloss up. No, I don't think so, because I think the standard is what, with respect to legislative facts, I think the standard is, is there a medical consensus that disproves the state's position, and the state's position here is that MDASM would work. And the medical consensus test you're getting from Bayes is that one? From Bayes and then from broader principles. We cite Gonzales v. Carhart in her brief, which is in the abortion context, but it was on the Supreme Court gave great deference to medical uncertainties. They gave great deference to the legislative branch. So it's broader principles outside the specific context of this case, and then that's followed up by what Justice Alito said in his Bayes concurrence. But was that adopted in Glossop too or not? I didn't see that in Glossop. Glossop did not have any language. It certainly looked at things outside of the cold record, right? It looked at the very beginning of this portion of its opinion, which was Section 5. It said we start with the following legal principles in mind before we delve into the facts. One of the second principles was that all of the courts to have considered this question prior to Glossop and prior to the district court in that case had upheld the MDASM 3 drug protocol, and so they took that into account. And they also took into account just the background principle that courts should not be going outside their areas of expertise by delving into the scientific controversies related to the death penalty and the drugs. The point in Section 5 is referring to their standard of review, isn't it? That's correct. And in the standard of review here, it's referring to the standard of review on the plaintiffs, I believe, that they have a very demanding burden that they have to show that they are sure or very likely that MDASM would not work to insensate the individuals to pain. So I think that actually helps us here as well. I think going back to whether, Judge Moore, your hypothetical at this court was first, it doesn't seem to me, if you look at the key pages of the district court's opinion, as I mentioned, page ID numbers 32226 to 28, nowhere in those three pages does the district court suggest that MDASM is not up to the task. It just suggested that it's completely uncertain. It points out how at 500 milligrams it's going to be quite unclear to actually uncover evidence on the point because as all the experts testified, there will be no clinical trials at that massive dose. So I don't even think there's a clear air finding to which you should defer here anyways. But setting aside, so I want to also make clear that there are two elements with respect to the Eighth Amendment claim, and those two elements both must be satisfied by the plaintiff. It's the plaintiff's burden to prove both a substantial risk of pain and in addition that there is an available alternative. Substantial risk, the court defines as sure or very likely. Absolutely. That seems to have been lost kind of in the opinion below a little bit. Absolutely. On the three key pages, that's why I think it's purely legal air here. We're not challenging any of the facts. It's purely legal air that just failed to recognize the standard of review and essentially said there's just uncertainty here, so I'm going to grant an injunction. There is a conclusion on one of the pages that you've cited, 32-8, that the court concludes that it will create a substantial risk of serious pain. But I think that's the ultimate legal conclusion. And in fact, that's what this court has already said. Granted, pre-gossip, but that's what this court already said in the Harbison case, that that is the question of law. And when you think about it, it's a mixed question of law and fact where you declare the erroneous finding to historic facts, but the ultimate legal conclusion, just like in the ineffective assistance context, the ultimate legal conclusion of deficiency is for the appellate court. And so I think that's what that standard was doing there. But this is all, so it's the plaintiff's burden both to prove substantial risk, which I don't think they did, and I don't think the district court even found that they met that standard, but they also have to prove an available alternative. Before you move to that, I'm struggling with your articulation of how the test would work because your significant scientific agreement strikes me as problematic, particularly in the situation that we're faced here where you're saying that the first district court to decide the issue that was affirmed then establishes the rule until there is a medical consensus. So under that, the first one says there is not a risk of substantial pain and is affirmed. Then let's say you have ten people who are executed with obvious and clear physiological responses, much like the ones that we've talked about here. They're gasping, they're heaving, they're clenching and unclenching, which the plaintiff's experts in this case said that that is a consciousness response, the clenching and unclenching, the heaving of the body. So even in the face of that real evidence of severe responsive activity in the men who are being put to death, until the scientific world catches up and somehow publishes some sort of an agreement in an article or the American Medical Association says, okay, we think this is a problem, you can continue to put people to death and continue to have inmates die in some of the circumstances that are articulated and described here. And that's okay. That meets the standard that you are articulating as governing cruel and unusual punishment. I don't think it would. So I think the facts of your hypothetical are far afield of the facts here. If you take the facts of your hypothetical, if there was, you're allowed to take subsequent facts into account in determining whether there is a medical consensus that it didn't work. If all the experts agreed that, in fact, those inmates had been conscious, I think that would. I'm really struggling with that. Anybody who's litigated knows that both sides are going to come up with their own experts. And those experts, not unsurprisingly, are not going to agree. That is the nature of litigation and the nature of expert testimony. So the question becomes, how many people do you have to see go through horrific execution before that can be considered without regard to whether somehow you can wrangle all the experts onto one page? So there would be a debate of whether a well-established consensus had been developed at the relevant time. So if the court discredited our testimony and said there is a well-established consensus based on these executions, then they could make that finding. But I don't think that has happened here. But isn't part of the reason why it hasn't because a paralytic is being administered? And the paralytic means that the reactions, the body reactions, are muted because the person is paralyzed. No, I think the main factual reason, because I don't think the hypothetical that you premised is this case, the factual reason is all but one of the executions to which they refer happened before the Supreme Court's decision in Glossop. And the Supreme Court in Glossop already said at the very end of its decision in Section 5C, I believe it was, that the Wood and the Lockett executions have little probative value. I think that is binding on this court with respect to those two. And I think McGuire... With respect to the, what was it, 100 milligrams in one of them, and one of them was 5 times or 15 times 50 milligrams, clearly there was a differing dosage used. So is it binding on those? And now what you say we have to have for us to take back up the issue would be a number of problematic executions with the 500 milligrams. Is that your position? Certainly it is. And I think the executions that their experts identified, except for the Smith execution, which I'll talk about in a second, the only executions that they identified were the Lockett execution, the Wood execution, and the McGuire execution. What about Brooks? So their expert did not seem to rely on Brooks. I can't remember the timeline with respect to Brooks. That was in January of 2016. Okay, so that would have been a subsequent one. And then there was a Rick Gray case.  The district court, I think, in its findings of facts, cited a National Catholic Reporter article or something with respect to Gray. But so if you unpackage it, though, the ones on which they rely mostly, Lockett and Wood, the Supreme Court has already rejected. They try to make a point about Lockett, that there is a new expert report or something in the record here which suggests that Lockett had enough midazolam in his bloodstream that should have allowed it to work. But that's the same argument that the petitioners and Gossip itself made. If you look at reply brief footnote four of their position there, they suggested that in that very case that the midazolam in the blood was greater than the therapeutic level necessary to render an average person unconscious in response to the same exact point that they're making now. So I don't think Lockett can at all be considered. I don't think Wood can at all be considered. With respect to Smith, we would recognize that that's a new execution and that there were movements. But I don't think movements are dispositive here. In fact, I think Workman, this court's decision in Workman itself suggests that because Workman upheld the use of the paralytic precisely because even when a drug that all individuals agree is up to the task, barbiturates, even with respect to barbiturates, we would anticipate movement with the use of the third drug. And this court expressly said the use of the paralytic is fine because of the dignity concerns. So I don't think movement is dispositive. And I think our experts and the district court in the Gray case itself has already rejected the use of Smith. When you say the dignity concerns, what do you mean exactly? So what Bayes said. So there's the dignity concerns of just protecting the dignity of the inmate. Paralyzing him protects his dignity. How does it do that? To ensure that he has a humane death for all involved. Bayes itself already found this point. I mean, the record does suggest that people go into convulsions, you know, even if they're unconscious, even with the barbiturates. Absolutely. Workman already made this point. Workman itself said that even with barbiturates, which is a drug that all agree would render you insensate to pain, we can expect convulsions when the third drug is administered. So I don't think that can be dispositive. In light of the evidence that was put forward in the district case, you had a number of individuals testify about never having seen this type of behavior before. Prison officials, reporters, federal public defenders, people who said, I have witnessed 50 executions and I have never seen this kind of activity. And that is not limited just to people who would be presumably on the side of the inmates. It included the prison officials involved in this very execution. How do you respond to that evidence? So I think with that evidence, the prison officials, in response to the McGuire execution, which were the most of the testimony ones, every one of them suggested that despite the movements, they believed that McGuire was unconscious. Even Alan Johnson, the reporter, used the phrase apparently unconscious, by which Alan Johnson suggested that he thought he was unconscious, but he wouldn't swear to it because he's not a doctor. So there's no testimony actually supporting the notion that Dennis McGuire was, in fact, conscious during the movements that we saw. That's not my question. My question is how do you respond to their testimony that this was physical activity that they had not seen in their witnessing of 50 executions, 11 executions? I don't know how many the prison officials. So my response is movement is not dispositive. What is dispositive? No, I'm sorry. My question is the movement is distinct and different from the movements that they had witnessed in the prior 50, 10, 9, however many executions they had witnessed. Because what we're talking about now is what this level of megaslum does, whether it functions to make one as a complete anesthetic so that pain is not felt, not getting into the remembered, pain is not felt. So what we have is people who are seeing different activity from what they have ever seen before. So I would agree with the point, but I still come back to the notion that movement is not dispositive. The key question is whether they were unconscious, and so insensate the pain. What does Bergesi, I'm sorry, finish your. I was just going to say that the key question is whether they're unconscious and insensate the pain, and all of the guards that witnessed McGuire thought they were unconscious, and it falls with the experts. The experts suggest our expert in particular, who's an expert on immobility anesthesia, made quite clear that on the spectrum, anesthesia works where it affects amnesia, it affects your brain, and then it affects consciousness before it affects mobility. So you can be unconscious and actually have movements, and that's already essentially what the court itself said in the Workman case as well. What does Bergesi, Bergesi seems to equate movement somehow with enough consciousness to feel pain. I don't recall if he specifically says severe pain, but he seems to be equating movement with pain. What's your response to his equating those things? I think Bergesi said that he agrees that unconsciousness comes before immobility as a general concept, and he said that at page ID 31649, and so I don't think there's disagreement on the point. I think Bergesi's main takeaway was that he clearly indicated that based on the science alone, he said, I think that the drug protocol would be up to the task, but then his entire opinion is based on just reading kind of what had happened. So when you take Bergesi next to Dr. Antonini, who was our own expert on there, where Antonini said quite clearly that unconsciousness comes before immobility, and if you would go into a normal operating room, you'd see all sorts of movements, you'd see all sorts of gasping, and that's not showing that they're in pain. So I don't think the movement alone is dispositive. But all this is beside the point, because they have to meet this element, and they also have to meet the next element, which is, is there an alternative available? What about their argument that, I mean, let's set aside their argument that you waived an argument against their second alternative, i.e. omitting the second drug. Let's just set aside the waiver issue. On the substance, just what is your response to that? Why is that not an alternative that would significantly reduce risk? So we're talking about the backup? They had several alternatives. One of them was addressed by the district court. Two were not. The two that were not, if I recall correctly, both of them would have omitted the paralytic. They're saying that would cause less pain, and therefore you ought to do that. What's your response to that? I think our response is, number one, that was the same argument that was made in Bays and Workman, and it was rejected by the Supreme Court and by this court. And then number two, I would point the court to the Eleventh Circuit's decision in Brooks, where Brooks said untested methods cannot qualify as an available alternative, and nobody has used the protocol to which they would have us turn, whereas the three drugs were. What will qualify as a legitimate alternative in your view, then? It can't be something that's untested. It has to be something that has been tried. So we would absolutely agree, and we actually want to use barbiturates. That was the one drug method that we had used for a long time, so that would be an alternative if it was available. But the problem is it has not been available to the state of Ohio since the fall of 2013. So we just disagree. So the district court said that – So we're sort of moving or jumping from one thing to the next because your red light is on. But you have said in your papers that you are seeking an import license for pentobarbital. Is that right? Correct. And I know that I'm asking you to speak outside of the record, but has there been any development beyond what was in the briefs? Not that I'm aware of. So because pentobarbital is a Schedule II drug, the application has to go through the Federal Register, and I do not believe that it's even been posted to the Federal Register yet. We did get an application with respect to sodium thiopentol back in December 2014, but unfortunately the FDA has taken the position that importing sodium thiopentol is illegal. Based on a D.C. Circuit case, that was a case involving prisoners suing the FDA to stop the importation of that drug. So we started with sodium thiopentol. When the FDA took the position that it did, we have since transferred to seeking a license with respect to pentobarbital. So suppose, hypothetically, someone who was sentenced to death said, I would like to take a heroin overdose. We read about this in the news all of the time about people who don't want to die who are dying from heroin overdoses. Would that be an acceptable alternative? I don't think so because the state agrees with the Arthur decision that it has to be an alternative available under state law, so that would be the legal constraint and also the practical constraint of that would be completely untested. Well, but everybody knows from reading the newspapers, and of course that's a valid source, I'm being somewhat sarcastic here, but that heroin overdoses are occurring unintentionally a lot. But the concern that I'm getting at is if the state says, well, there's only one alternative that we allow, which is a barbiturate, and it's illegal to bring them in, then you are making it impossible for someone to provide an available alternative. I don't think so. So I would agree with the Arthur's ruling that it has to be limited to state law. So in the state of Ohio, what is the issue? I'm pretty confident that it's just lethal injection at this point, but I can't say I'm 100% sure. And why would a lethal injection of heroin not be acceptable then? So the state would also take the position that it has to be a tested method, and that would be an execution. How can you test methods? Well, or at least have some type of expert testimony on the point, and that gets back to Glossop's point that you have to plead and prove the alternative, and they haven't even attempted to plead. That's a different response than saying- That's a fair point, but you're catching me off guard because nobody has suggested that type of- I'm trying to. I said it was a hypothetical. Be prepared to deal with all hypotheticals. Absolutely. And so the first order of response is they have not pled that, and then the second order of response is if they actually pled, and a medical expert came in and said it was easy and said it would have no pain, it could easily be implemented by the state, that that would be a- so maybe they could overcome the practical constraints, but they have done none of that here. Can I ask just one question out of curiosity? People are put under general anesthesia every day in this country, you know, Lord knows how many times, and the drugs for that are presumably, you know, all over the place. Why can't the state just do something along those lines? Get the profilol or whatever they were talking about, and this isn't like-I'm just curious. I really think Glossop is accurate. I think the- Okay, but it's not ideal, and we know it's not ideal, right? I mean, you don't want to use it. You want to use barbiturates, right? I mean, this is itself kind of an alternative before the other one became unavailable, right? Absolutely, but I don't think-so the manufacturers that refuse to sell us barbiturates, which we have not been able to obtain, I think we most likely face the same constraints, even with respect to the general anesthesia that is used every day in the hospitals. All right. I was curious about that. Thank you. So I'd like to reserve the rest of my time. May it please the Court, Aaron Gallagher Barnhart. I represent Appellee Raymond Tibbetts, and I'm also presenting argument on behalf of all three of the appellees today. We ask this Court to hold that the District Court did not abuse its discretion in preliminarily enjoining the state from using certain drugs to execute these appellees, pending a full trial on the merits of both their judicial estoppel and Eighth Amendment claims. I'd like to begin by addressing your concern, Judge Kesslidge, about how the Eighth Amendment could mean something different in different states. If I can just build that hypo a little bit. Sure. I mean, it seems like we have litigation in several states with pretty much the same protocol, at least as far as the drugs are concerned. Yeah, I have something to say about that. I mean, but, you know, substantially the same protocol. Let's just put it hypothetically. You could have litigation in several states with the same protocol, some of the same or many of the same actual expert witnesses, some of the same testimony, district judges interpreting the testimony differently in two different states, and then a deferential standard of review, kind of per your argument here, driving appellate results to affirm, and then the Supreme Court doing the same ultimately and saying the protocol is constitutional in Alabama, but the same protocol is unconstitutional in Arkansas. And that just seems like a, that just, my instinct tells me there's something amiss there. I agree with you if that was the situation. I'd like to explain why I don't think that. Sure, no, that's why I'm asking. So the first, I think, problem of that premise is that it is not the same protocol. Although the Oklahoma protocol and the Ohio protocol are similar in respects to the amount of lethal drugs, they vary widely in other respects, and the Glossip Court noted this in particular in relying, well, in affirming the district court's reliance on the safeguards that Oklahoma has in its protocol that Ohio does not. This is that 135 Supreme Court. Sure, I mean, but that, in fairness, I think that's a pretty secondary point in their opinion. I mean, that's not the real driver, I don't think. I mean, be that as it may, it's very significant. These are things that in this litigation we have thought about for years. I mean, Oklahoma uses a physician to do their consciousness check. That's a big point of contention here. They use an electrocardiograph to monitor blood pressure, oxygen saturation, heart activity. These are major points of contention because the plaintiff's position is that midazolam cannot get this person to the level where they need to be to be insensate to pain. I guess, though, I mean, stepping back, my question is really about, you know, what weight ought we to put on Glossip's factual holding? And I read your brief to say none because it's a different record and the district court made its finding here and we simply defer to that or to some extent defer to it, large extent defer to it. And I guess, you know, I wonder if the truth is somewhere in between on this, that the Glossip court does couch this holding in terms of the standard of review. And I think it's a very fair reading when you say that that holding doesn't bind us here because its terms were specific to the record. But the court in Glossip did have a fair amount of reasoning that was not just merely interpreting the factual record there. I mean, part of it was they said Lockett and Wood are irrelevant. It's kind of an evidentiary determination made by the Supreme Court. I think they said something about, you know, like a five milligram dose of, I'm working on this, myazolam doesn't really tell us much about what happens with 500. And so I guess, isn't it fair to say that those other parts of the Supreme Court's reasoning that aren't simply specific to the record in that case, those are binding for us. Well, they're at least extremely persuasive or influential on the court. I mean, we would kind of ignore that. Right. I don't dispute this kind of middle area that you're proposing. I mean, one of the reasons the Supreme Court gave in affirming in Glossip was that many other courts had approved of midazolam. But the court didn't say that it was an irrebuttable presumption that cannot be overcome. And so I think that is where we are. I mean, obviously this court isn't going to pretend Glossip just doesn't exist. I mean, that makes our burden even more difficult. But that doesn't mean we can't overcome it, and we did. And, you know, this legislative facts idea that the state is proposing comes down to one Seventh Circuit case that obviously isn't binding on the Sixth Circuit. And, in fact, that Seventh Circuit case relies on a previous Seventh Circuit case both by Judge Easterbrook, a women's choice, Eastside Women's Clinic versus Newman. And in Newman, Judge Easterbrook specifically said that, this is a quote, findings based on new evidence could produce a new understanding and thus a different legal outcome. So even the case that they rely on to say that these facts are binding recognizes that if facts change, which they did, executions happened after the Glossip hearing that matter. So what particular, your opponent said that all of these executions were before Glossip. Right, that's not correct. And so what ones do you rely on? Brooks, there's Smith, there's Gray. Is there anything else? Brooks and Smith. Gray happened after the hearing concluded in this case, so the district judge noted that. It wasn't something that we presented record evidence on. We also, our expert offered analysis based on executions that had happened before that gave a new understanding to what was happening. And so I don't know if you've had a chance to read Dr. Bregezi's extensive testimony, and it is extensive and so is his report, but it's extremely thorough. And what Dr. Bregezi explained and what the district court found credible, and there's many reasons why Dr. Bregezi is much more credible than Dr. Antonini. Yes, Dr. Antonini worked with immobility, which means he would, like, cut the spinal cord of animals and then see if they would still have a reflex movement. Inhaled. Well, that's a separate, the chart that Mr. Murphy was talking about where, you know, he talks about movement before consciousness. Yes, that has to do with inhaled anesthetics. It has nothing to do with injected anesthetics like midazolam. But to just address that point, what Dr. Bregezi explained about that is that that space, if you look in the record, you can see the chart and the space between it. Dr. Bregezi explained that movement is an announcement of consciousness. And he said, and Dr. Antonini agreed, that if he was in surgery and a patient started moving, he would give him more drugs. The Eighth Amendment standard is not the medical best practice. That's absolutely true. But it's relevant to say that if someone is moving during surgery, an anesthesiologist can say, ah, no big deal. But it doesn't mean it's sure that they're feeling severe pain. It means that they are approaching it. I mean, that's the point. Movement announces that consciousness is knocking on the door. I mean, well, I do want to hear your answer to Judge Moore's question about which executions you're relying on. We sort of got on a regression, but I'll just cease on this point. Okay. What Dr. Bregezi explained is looking at the consensus of all the data. Which executions? I mean, because I thought they were relying on primarily Wood, Lockett, Smith, and McGuire. And Brooks, which is another outlier. I thought the experts kind of focused on those four. And in addition, he looks back at the Florida execution. He looked at every execution that had used a desk. He sort of wrote off the Florida ones. I disagree that he wrote them off. First of all, what he said is in Florida, not only is the paralytic put on board immediately so it would be masking movement. Inmates in Florida are bound like a mummy. Their feet are bound. Their hands are bound and tied down. So the movements in Florida, which was a head movement, an eye flicker, I mean, that's the only thing you could see. And Dr. Bregezi agreed that alone those movements would not tell us anything. But the consensus of the data all points in the same direction. And his expert analysis was because – I'm sorry? Whose consensus? I don't understand what consensus you mean. The consensus of the data of all these executions. So, again, one execution where there's an eye flick, something that perhaps could be considered reflexive but not purposeful. The Columbus dispatch person said that he had seen the hand clenching in 19 prior executions with barbiturates. That's not my recollection of his testimony, that he'd seen it in 19 prior executions. I'll double check. You might know it better than I do. But that's my recollection. I mean, hand clenching, I'm pretty confident in the record there was a fair amount of evidence that hand clenching and sort of foot movements are pretty common. I mean, there's a reason why – I mean, we talk about strapped down. You know, people under general anesthetic procedure are often strapped down for this reason. People move. But it doesn't mean they're feeling pain the same way you and I would right now. Right, and that's why Dr. Bregezi focused on purposeful signs such as speaking, such as trying to sit up. That was one case, though, right? Are you talking about McGuire? McGuire and Lockett also spoke, and I'm not sure. Lockett. I mean, Lockett had a lot of problems. I mean, that was just sort of a – you know, he had – He did, but he had more than enough of what the state experts say midazolam should be enough to – I mean, the Supreme Court said it's irrelevant. I mean, they did say that. Well, the Supreme Court was responding to an argument that the state was making there, and let me back up a minute. When we're talking about the Eighth Amendment here, I want to make clear that the state's position down below was not that they've offered proof that midazolam is safe. And I know that's not their burden anyway, but to read their briefs, you would think that that's kind of what it was. I mean, the state's position was, yes, midazolam can't get you into that level of general anesthesia, which is necessary to render someone insensate to pain, but it doesn't matter because it has an anterograde amnesic effect. You're not going to remember it. I understand. That's what happens with a colonoscopy. The amnesia thing, probably that doesn't work for the Eighth Amendment. You know, I mean, I could just sort of hypothetically stipulate to that. Okay. But that's what the district judge's factual findings were based on. It rejected the state's theory. The state also – But you know it's your burden. And let me just kind of just tell you candidly my concerns about the district court's reasoning, which is there wasn't much of it. The bulk of the court's opinion, as we sometimes see, is just reciting, you know, one side's testimony, the other side's testimony. And its findings are almost conclusory. And moreover, it doesn't mention the standard when it's making – sure or very likely to cause serious pain. It doesn't really seem to grapple with that. I mean, I think we have to grapple with it. I've been trying to grapple with it while I've been reading this for the last two weeks. And the opinion doesn't seem to help us grapple with that level of certitude. Let me direct your attention to a second order that the district court entered after the state moved to stay the preliminary injunction. That's Record 982. And I'm not going to disagree that there are ways that I would have written the district court's opinion differently to defend it on appeal. But if you recall, which you probably do from some of the briefing about expedited – the request for expedited appeal, the district court held a five-day hearing. It had an execution date looming. It took very seriously its responsibility to give the appellate court time. It issued a 119-page opinion. Yeah, it's not perfect. But then on Record 982, it comes back and says – I have the quote here to read – in a way that I think helps you understand that its findings are not limited to what the state is saying, just those three pages. The district court said, as the preliminary injunction decision hopefully makes clear, a great deal of evidence lay in expert has accumulated about midazolam as an execution drug since its use in January 2014 to execute Dennis McGuire. And he references, you know, this massive summary of findings. Now, would it have been better if he had been more specific about each of these findings? Yes. But, I mean, when we're talking about a district court – It's kind of like G.E.V. Joyner. You know that case under the Daubert Trilogy, G.E.V. Joyner? Okay. And he had a very qualified expert, and he points to a lot of data. And he says, well, I've looked at all that data, and therefore the PCBs that the plaintiff was exposed to when he was doing electrical work caused his cancer. And the Supreme Court said that is inadequate. It should have been excluded because there's an analytical gap between the data and the conclusion. And I'm just trying to be very candid with you. I like to tell people what my concerns are rather than sort of hide them. And my concerns are that there seems to be an analytical gap in the district court's reasoning, number one. And kind of more specifically, when the standard – the district court seemed to base its decision on uncertainty about midazolam's effect. When, as I read Glossip, and we've got to take the standard as it comes to us, it requires certainty. We're close to it. In your favor. So to that I would say that unlike in the Daubert case, we don't have an analytical gap among the expert testimony. I'm not saying that would apply technically. Sure. But I think it's the difference that matters here when we're talking about reviewing a district court's findings, especially considering the circumstances here. There are definitely adequate analytical connecting of the dots to support the district court's conclusions here and factual findings. One question along that line. It seems to me that part of the long number of pages recounting the testimony of various experts also entail action in this opinion that indicates an acceptance of the credibility of plaintiff's experts as opposed to those offered by defendants. And I'm struggling with how much when you say here's everything this expert said and here's everything that expert said, because this expert had this training and is engaged in this type of research, I find this expert more credible. I see some of that there. I recognize that it's not as clear. There's a bit of reading between the lines. I agree. For instance, the state's expert, Dr. Buffington, came in and said that in his report and in his testimony that he could show midazolam could get you on the bispectral index, the BIS, below 60. Well, he didn't. None of the studies he cited said. And so in recounting that testimony, agreed, it would have been nice to have a headline that says that. Or, you know, similarly, Dr. Buffington and Dr. Antonini disagreed themselves about the existence of a ceiling effect. And the decision below references those items that both or all or three out of the four experts agreed upon, which partially formed the basis. Yeah, for someone who was there for the whole week, these things stand out because it was obvious to those in the courtroom when someone was, you know, getting destroyed on cross-examination when they were coming across as credible or not. But I can appreciate the frustration to an outsider that it takes a little more parsing to work through those. But I would just suggest that especially considering the circumstances, the massive amount of testimony that is synthesized in a short amount of time and the type of, you know, review an appellate court should do, that's not a legal error that justifies reversal. Or at a minimum, at most, if this court is uncomfortable, there could be a remand to ask for more explicit factual findings. But it's not a reason to reverse and overturn the very careful fact finding that I know the district court did. I mean, if you read the transcript, I don't know how he did it. The district judge doesn't miss anything. I remember I was examining an expert and accidentally said midazolam instead of gabba, and the district judge right away jumped in and corrected me. I mean, he was paying attention the whole time. And simply because his opinion doesn't reflect it as clearly as it could be, that's a separate question from whether this court should reverse. He did clearly an exemplary job of managing the testimony. But as to legal error, I mean, I just continue to wonder. I mean, he seems to base it on uncertainty when it requires certainty. And that's a mistake. That's a legal mistake. If that is true, if it's true, that's a legal mistake. Right. If it was true that he simply said that all we had proved was uncertainty, obviously we cannot meet our burden. But I don't believe that is all we've proved. I believe Dr. Bregezi's testimony and expert report renders the type of certainty. The court's holding is couched in those terms is what I'm saying. It seems to be. Yeah. You know, that we just don't know and they haven't established that it, you know, renders the person insensate and, therefore, we're going to issue an injunction. Right, right. I mean. Glossop's a tough standard. I mean, you know, Justice Sotomayor criticizes it very strongly, says it has tough consequences. It is a tough standard. And to kind of get back where I intended to begin is as far as how it can be different in different places. Besides the fact that protocols can be different, and I believe Oklahoma and Ohio are different in significant respect, it's a comparative standard, right? You're asking whether the alternative that we're offering reduces the risk of harm that's posed by the state's protocols. It's only in the second prong of it, though. The initial prong, I mean, and I want you to tell me if I'm misunderstanding. I read that to be more of just an absolute question, whether the extant protocol is sure or very likely to cause serious pain, period. Well, I think there's a lot of statements in both Bayes and Glossop, and it's difficult to distill, you know, if the first prong is in a vacuum, a substantial risk of harm, because I think if you read what the Supreme Court has said, particularly if I'm remembering right in Bayes, it kind of puts it all in one sentence, a substantial risk of harm when compared to the known and available alternatives. So the alternative, to get to that part of your argument, the alternative is the pentobarbital? So as the previous argument was discussing, there's more than one alternative. The alternative that was directly addressed is pentobarbital. But as I think just Heathledge pointed out, we have a second and third alternative that involves removing the paralytic as well. And there's basically no doubt that we succeed on that ground, because there's direct findings that the paralytic meets the substantial risk of harm standard. Removing it obviously would remove that type of harm. The state's only objection to that is that they're not required to remove the paralytic, but that's not what we're talking about here, of course. And more importantly, unlike other states that may have a dignity interest, in this state, in Ohio, the director, Moore, testified in his deposition that the priority for Ohio is the humanness of the execution. That trumps any other concerns of dignity or anything or speed or anything like that. One question about the standard here. It has to be readily available, right? As a practical matter, doesn't that require that the alternative be permissible under the Eighth Amendment to be readily available as a practical matter? I'm not sure I understand your question. In order for an alternative to be readily available to the state, it's readily available as an alternative to the protocol that's being challenged. For it to be available in fact, doesn't that alternative have to be constitutionally permissible? Otherwise, they can't do it. It's not available. So I guess I would say if it got to the point where a particular inmate was pressing this claim at trial, would he have to waive any constitutional objection to the alternative? I'm really just asking about the meaning of the glossification. If they said tomorrow, okay, well, we're going to go with your alternative too, then I presume, because your brief is candid on this point, that you would object to that under Eighth Amendment grounds. No, and I want to make this clear. That's a separate. That's talking about the hydromorphone and midazolam method that was used for Dennis McGuire. We have not offered that as an Eighth Amendment alternative. What is your Eighth Amendment alternative? The Eighth Amendment alternative is a barbiturate pentobarbital, or it is the three-drug protocol removing the paralytic. So three drugs starting with midazolam. Right, midazolam and then potassium chloride. And also, there's also monitoring involved in that, like the kind I was mentioning Oklahoma has. But if that latter alternative is a violation of the Eighth Amendment, doesn't that mean the alternative is not available because they wouldn't be able to use it? So that's why I think what I'm saying is, right, if a petitioner or an inmate is going to offer an alternative, I think the petitioner could be foreclosed from then turning around and arguing that the exact alternative that he offered is barred as unconstitutional. So I guess, I mean, I'm not, I'm truly not trying to get more, I'm just trying to understand. Just to make clear, the midazolam. I'm sorry? So they could use that here? Is that what you're? They could use that alternative here? Alternative to? Now, I mean, they can't because the judicial estoppel holding is preventing them from using the third drug. You can set that aside. Sure. Yes. I mean, I think, I mean, you know, stepping back to the complaints that we had to file weeks after we got notice of this, we preserved everything, right? But if this goes to trial and these, you know, one or more of these appellees press that as the alternative, then I think it, I certainly think that's fair to say that they couldn't then challenge the constitutionality of the alternative they offered. Are you offering that as an alternative right now for your three clients? Yes. Removing the paralytic. Removing the paralytic and otherwise doing the exact same protocol. Drugs, not the exact same because there's monitoring concerns. I mean, we don't believe midazolam can do what the state says it can do. And so because of that, the alternative includes monitoring that would show if midazolam is working or not. And if it is not working, then the potassium chloride would not be injected under the alternative. But I thought that one requirement is that the method be legal under state law. And the state protocol has the three drugs, no? Well, I think there's a difference between the statutory law of the state and the protocol, which is enacted by the Department of Corrections. So as Mr. Murphy said, the statute simply requires lethal, you know, injection of lethal drugs. And over the past, you know, 10 years or so, the state, the Department of Corrections has changed the actual drugs in the protocol many times. But there would be no bar as far as what's legal under state law to this alternative. Like there would be, like in the 11th Circuit case, if, you know, firing squad or, you know, electric chair, some other method that's not in state law was proposed, that would be a separate question. But there's no concern that it would be illegal under state law to do this. So you mentioned briefly judicial estoppel. Yes. I want to address that. The concern that I have is the Terry Collins affidavit, which seems to be saying that the state is not going to use the paralytic and the third drug. Right. So, I mean, that's my concern, too, because that is, I believe, what they said, not just what his affidavit said, but that affidavit was attached to a legal brief that in the context of defeating, you know, the exception to mootness, that if something is voluntarily ceased, it could be resumed, and therefore it would not be moot, those statements were used to prove in very clear language that the state was promising not to use the second and third drugs again, and not just, as the state says, for one person's execution, but for all the plaintiffs. It speaks in terms of Ohio's execution method. Well, they were changing their protocols, as states frequently do, and they were saying going forward, here's what we're going to do. I mean, I just, I really have a very hard time seeing how in a case involving individual named plaintiffs, which is what that was, right, and these plaintiffs here were not among those plaintiffs. Is that correct? These individuals were, and it gets a little procedurally complicated because there were many cases at that time in the district court. They have since been consolidated into the current case number. It seemed like it was specific to the executions that were, you know, about to happen there, not for all. It just, it seems like a real stress to read that as some pledge for all time. Well, if they weren't willing to make that pledge that it was more than just the next execution, they would have been defeated on the voluntary cessation exception. Not if they were going, you know, if by all indications they were going to execute everyone who had an interest in that litigation with the new protocol, then it is moot. Right, but they didn't. That's the whole point is that these appellees had an interest. Okay, but, I mean, that does kind of lead into the other point, which is, you know, rather dramatically changed circumstances, which are no fault of the states. I mean, Glossop says this, we're kind of, you know, this is... Yeah, I'd be happy to address that. I mean, it's opponents of the death penalty who have made this unavailable. Ohio didn't create this problem. Ohio had a multi-year hiatus trying to find those drugs for the protocol that... And so, I mean, are they just never able to execute their criminal judgments now because, you know, some folks got the companies not to sell it anymore? No, and on this point, I'd like to make particularly clear that if the state wants to argue that changed circumstances justify an exception to digital estoppel, it's their burden to prove what efforts they have made to get these drugs. They've tried not to do that because it's our burden on the Eighth Amendment. But in this instance, and I'll refer you... They haven't executed anyone in how long? In three years. While they're trying to get those drugs, presumably. Presumably, but there's not... It was because they were trying to get the drugs. The state executed someone without barbiturates, Dennis McGuire, and that's where this, my dad won hydromorphin, comes in. So they're not foreclosed from doing that. I mean, they have their own reasons, perhaps, why they're not doing it because it was... Well, we differ on what actually happened at that execution, but if they're deciding not to do it, it's not because they can't. That's a decision that they've made. The state, as this court knows... Getting barbiturates is what they can't do because they can't get them. Well, again, the state has not proven that it can't get barbiturates, and in particular, the state had an opportunity to present this evidence. Director Moore was on the stand, and descendants council started asking him about efforts that they had made to get barbiturates, and we objected and said, if you're going to open the door on that, then we're going to ask questions too that we are currently foreclosed from asking by the protective order. And with that objection, the state ceased that line of questioning. They had the opportunity to present this evidence. They chose not to. Look at their brief. They say that there's no... They haven't been able to get these drugs in three years, and they cite that part of the hearing where they explicitly declined to go forward in presenting evidence. Do you believe that they've had the drugs all along and just prefer to use them? No. It's my belief that they really haven't tried to get the drugs. Let me give you an example. Richard Theodore is the pharmacist for the state of Ohio. In his deposition, he talked about obtaining the drugs that they use now for the midazolam protocol. And as was alluded to, the manufacturers of these drugs don't want their products being used to kill people, and so they have instituted various restrictions on their use or sale for execution. Richard Theodore testified that although he told the vendor that the purchaser of the drugs was a Department of Corrections, he did not reveal that they were being bought for use in execution. That's record 881-1, page ID 29183. When the state wants to, they will go right up to the line of what is ethical or legal to get these drugs. On the other hand, their 30B6 witness, Edwin Borey... I have one more question I'll say on this point. All right. I have one more question before you sit down. There is a dispute between the parties about why some other states have discontinued the use of midazolam. What is your position on why Arizona, Florida? Why have there been several states that have abandoned the use of midazolam? I don't know the answer to that. It's not in the record. I mean, evidence of them abandoning is in the record. There was, I think, like a press release that came out during the hearing from Florida, and there was a settlement I think that happened shortly before the hearing in Arizona, and that was introduced. But the state suggests in its brief that that's because the states can't get those drugs, and there's simply no evidence. There's no evidence in the record. And what is in the record is that Ohio has a lot of this drug. So Ohio has been able to get many, many, many of midazolam, yes. If there are no further questions, we ask the court to affirm the district court. Thank you. Just very briefly, Your Honors. First, I'd like to just quickly talk about judicial estoppel. I think the key point about judicial estoppel is the key factor is whether there has actually been gamesmanship here. And the district court, when it denied our stay, expressly disclaimed any finding that Ohio has engaged in gamesmanship. That's at document number 983, page ID 37112, and that's precisely because of the new circumstances. It's seemingly undisputed. At the time, in 2009, we had no problems whatsoever obtaining sodium thiopental. Now we cannot obtain it. So with respect to judicial estoppel, I think the district court's own finding that there was no gamesmanship disproves that it should apply here. With respect- Even in light of the argument that the way the procedure occurred in the statement of the state enabled the state to obtain all the benefits that it sought in that litigation. Absolutely, even in light of that, because under the New Hampshire factors, one factor is you have inconsistent positions. Another factor is whether those positions, even if they are inconsistent, led to a misleading of the court. And I think the district court's order on the denial of the stay, where the district court expressly disclaims any finding of gamesmanship on the part of the state, shows there was no misleading, even if you view the statements we made in 2009 as inconsistent with the change in the protocol today. But even setting aside the gamesmanship factor, which I think is the key point about judicial estoppel, I don't think the positions were inconsistent for precisely the reasons Judge Kethledge mentioned. In the Sixth Circuit, the issue in the Sixth Circuit was whether this court should vacate Kenneth Biro's injunction, and whether the court should vacate Kenneth Biro's injunction was Biro-specific and simply injunction-specific. And this court's finding that the injunction, because it was based on the old protocol, is now moot, has nothing to do with whether Ohio can change its protocol for other plaintiffs today. That is why the district court relied on the success in the Sixth Circuit, but then an argument made in the trial court. But the argument made in the trial court was when it was any summary judgment motion that was withdrawn by the state. So that summary judgment, obviously the state did not succeed on that summary judgment motion. I guess I'm just struggling just briefly that the state effectively did succeed because the injunction was dissolved, Biro's and a group, and you can probably tell me how many other inmates were executed because that had been listed. So they were placed in the position to be able to go forward completely with execution protocols, not just for Mr. Biro's, but for a number of other following inmates. Am I wrong? The injunction was actually just Biro-specific, and so the state appealed just with respect to Biro's, and the Sixth Circuit proceedings were only with respect to him. So this court said in United States v. Owens that judicial estoppel can only apply to the specific argument accepted by the court. The only argument accepted by this court was that the injunction with respect to Biro's was now moot. That is not at all inconsistent with changing a protocol many years later. That argument is still open. Granted, it was in summary judgment motions where we tried to get this entire case mooted out, but obviously we were unsuccessful in that respect since litigation has been ongoing ever since. So I don't think we succeeded, so I don't think our position now is inconsistent with anything we succeeded on then. But setting that aside, the new facts and new circumstances of the inability of us to get a rich witch shows there's no gamesmanship, and that independently precludes estoppel. Didn't you succeed in the sense that you withdrew your summary judgment motion and you didn't lose on that, but you just withdrew it? Certainly, but I don't think it – our summary judgment motion asked for a final judgment in all of the litigation. That obviously did not happen because the plaintiff, even Biro's, was allowed to continue litigating. After the mootness finding by this court with respect to Biro's, Biro's challenged the new protocol and made it all the way back up to the Sixth Circuit before he was executed then on merits with respect to the new protocol. So I don't think our summary judgment motion, which requested a final judgment, can suffice. So just a few other thoughts. The district court – you'll search the district court's opinion in vain for any type of credibility finding, and I think you have to stick to the actual factual findings that the district court made, which is why I think it committed a legal error because on the key pages the district court said, essentially, based on the record evidence before me, I see uncertainty here, and I think that's enough to grant the injunction in this case. I'm looking at 32226, where the finding is, first of all, there appears to be consensus, and the court finds that administration of a paralytic drug and potassium chloride will cause a person severe pain. Isn't that a finding in light of the evidence that is the first step in the process? Absolutely, but that's a finding only with respect to the second and third drugs. That finding was essentially made by Bayes, that the second and third drugs are painful. The key question here, however, is whether the first drug – in Bayes, it was sodium phatopentyl, I believe. In this case, it's midazolam – whether that would insensate them to that pain. And on that finding, if you look at the next pages, the court clearly says only that the different drugs show different bodily movements and that we can never actually do research with respect to 500 milligrams of midazolam because there would be no clinical studies at that amount. Because it's such a massive amount, there would be no therapeutic uses. So I don't think there's any finding anywhere in here that midazolam makes it very likely that it would not render the person insensate to the pain with respect to those two drugs. With respect to the conscious checks, I would just point briefly to the district court's analysis and its rejection of their equal protection claim. With respect to their equal protection claim, they did raise that states' conscious checks were insufficient, and the court expressly rejected that on page 32234 of its opinion, where it says, for this court to attempt to prescribe what conscious checks must be performed and what results must be obtained would make it a micromanager of Ohio's execution protocol. When you look at GLOSSIP 2742, it specifically says that Oklahoma has adopted important safeguards to ensure that midazolam is properly administered. And then it walks through three particular requirements and explains what role those have in minimizing the risk that someone will be experiencing pain. So why is that not a key part? Because I think the district court's analysis with respect to Ohio's conscious checks were that they were sufficient. I would point out that Ohio does most of the conscious checks that were at issue in GLOSSIP, and Director Moore testified at page ID 31940 to 31941 that he planned to use two drug administrators to do the conscious check. So that's different and additional protection than what was at issue in GLOSSIP. And in fact, in Bays, Justice Ginsburg complained that the Kentucky protocol lacked any conscious checks. So this is one step above. And their answer was that Oklahoma has accommodated each of those concerns. And so has Ohio. We have Director Moore testify that there will be a requirement of two IVs. And Ohio's counsel said that there are significant differences. The most significant difference, it seems to me, is the EKG. But I think Ohio responds that if we have two drug administrators doing the conscious check, that is pretty good evidence with respect to whether they would be adequately unconscious. What kind of conscious check do they do? It's the ones mentioned in Justice Ginsburg's dissent. It would be flipping the nail, doing the eye. There's the vocal conscious check as well. This is all in the record. What I think GLOSSIP said is the rough-and-ready conscious checks that paramedics routinely perform. If there are no further questions, I'd ask that the Court reverse. Your opponent did mention the idea of eliminating the paralytic. And, as I understand it, said as long as there were adequate consciousness checks, that that would be a satisfactory alternative method. What is your position on that? I don't think it is. I think it's an untested method. I think a very similar argument was made in Brooks. In the Brooks case in the 11th Circuit, they suggested you could just use a massive dose of midazolam alone. And the Court said an untested method is not a sufficient method. I'd also point that the very notion that midazolam can be used with potassium chloride is a suggestion that midazolam will adequately insensate them to the pain caused by the potassium chloride. And if it adequately insensates them to the pain from the potassium chloride, it will obviously adequately insensate them to the pain of the paralytic. The thought may be that if you don't have a paralytic on board, that you would be able to see that the person was reacting to pain more easily. That's the entire point of having the drug administrators do the conscious checks, to ensure there's a stoppage after the midazolam, that the person is unconscious before the second and the third drugs are performed. The 11th Circuit in Brooks said that was sufficient. I think this Court should follow that case. Thank you. Thank you both for your arguments. The case can be submitted.